IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Troy Allen Camper, | ) | C/A No.: 1:14-4801-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

On April 18, 2011, Plaintiff filed applications for DIB and SSI in which he alleged his disability began on May 15, 2010. Tr. at 142–43, 144–50. His applications were

denied initially and upon reconsideration. Tr. at 92–97, 102–04, 105–07. On May 9, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Peggy McFadden-Elmore. Tr. at 30–87 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 22, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–27. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 19, 2014. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 36 years old at the time of the hearing. Tr. at 66. He obtained a general equivalency diploma ("GED"). Tr. at 67. His past relevant work ("PRW") was as a coin machine operator, an equipment operator, a forklift operator, a crane operator, and a cabinet builder and installer. Tr. at 80–82. He alleges he has been unable to work since May 15, 2010. Tr. at 65.

2.     Medical History

On May 12, 2010, Plaintiff presented to family physician J. Frank Martin, Jr., M.D., ("Dr. Martin"), with leg pain that he stated had been bothering him for a year. Tr. at 334. Dr. Martin noted that he had previously diagnosed Plaintiff with restless leg syndrome and prescribed Vicodin, but that Plaintiff indicated his symptoms were not responsive to the medication. *Id.* Plaintiff indicated his leg pain was associated with cold,

numbness, trembling, and difficulty standing. *Id.* Plaintiff also reported sinus pressure and headaches. *Id.* Dr. Martin indicated he would refer Plaintiff to a neurologist if lab work was normal. Tr. at 338.

Plaintiff presented to Dr. Martin on May 21, 2010, complaining of pain radiating from his lower back to his legs that was unresponsive to Vicodin. Tr. at 328. He indicated his symptoms were constantly present and were exacerbated by walking, squatting, working, and performing any activities. *Id.* He described the pain as burning, radiating, and throbbing. *Id.* A computed tomography ("CT") scan of Plaintiff's lumbar spine indicated mild spondyloarthropathy with no high grade neural effacement and no acute or aggressive bony abnormalities. Tr. at 579. Dr. Martin referred Plaintiff to neurologist Alan R. Morgan, M.D. ("Dr. Morgan"), for an evaluation. Tr. at 331.

On May 27, 2010, Plaintiff complained to Dr. Martin of pain in his lower back, arms, and legs. Tr. at 324. He indicated Demerol dulled his back pain, but did nothing for the burning pain in his legs. *Id.* Plaintiff also reported the tremor in his arms had recently worsened and that he sometimes experienced shooting pain in his arms. *Id.* Dr. Martin indicated the CT scan showed mild spondyloarthropathy with no grade neural effacement. *Id.* He observed Plaintiff to be slightly tender to palpation along his lumbar spine, but noted no other abnormalities. Tr. at 326. He instructed Plaintiff to keep his neurology appointment with Dr. Morgan and indicated he would consider magnetic resonance imaging ("MRI") of Plaintiff's cervical spine. Tr. at 327.

Plaintiff presented to Dr. Morgan for a neurological consultation on June 7, 2010. Tr. at 232. He complained of bilateral leg pain that was not accompanied by back pain.

*Id.* Dr. Morgan indicated the etiology of Plaintiff's leg pain was unclear and that Plaintiff should return for electrodiagnostic studies to further investigate his symptoms. *Id.* He prescribed Lyrica. *Id.*

On June 23, 2010, Plaintiff followed up with Dr. Martin regarding his lower back pain. Tr. at 320. He described the pain as aching and sharp. *Id.* Dr. Martin diagnosed elevated blood pressure, peripheral neuropathy, and low back pain. Tr. at 321. He indicated Plaintiff needed further testing, but was "selfpay" and could not afford the recommended tests that included MRI and nerve conduction studies ("NCS"). Tr. at 323. He advised Plaintiff to contact the Free Clinic. *Id.*

On July 20, 2010, Plaintiff presented to Dr. Martin to discuss his leg pain and medications. Tr. at 317. Plaintiff indicated he had been out of Vicodin for several days and was experiencing significant pain. *Id.* He told Dr. Martin that his heart began to race and his blood pressure increased when his pain was at its worst. *Id.* Plaintiff described his bilateral leg pain as constant, aching, sharp, and stabbing. *Id.* Dr. Martin refilled Plaintiff's medications. Tr. at 319.

Plaintiff followed up with Dr. Martin on August 19, 2010. Tr. at 310. He indicated he was generally doing well, but complained of significant leg pain that was no longer responsive to Vicodin. *Id.* Plaintiff described his leg pain as severe, aching, and aggravated by everything. *Id.* Dr. Martin prescribed Oxycodone for Plaintiff's pain. Tr. at 312.

On November 5, 2010, Plaintiff presented to Dr. Martin with sinus congestion, chronic cough, dizziness, and headaches. Tr. at 306. Dr. Martin diagnosed acute

maxillary sinusitis, cervical radiculitis, and low back pain. Tr. at 308. Plaintiff visited Dr. Martin to discuss his medications on December 6, 2010. Tr. at 303. Dr. Martin assessed acute maxillary sinusitis and low back pain. Tr. at 304.

On December 20, 2010, Dr. Martin noted that Plaintiff continued to experience severe pain. Tr. at 299. He noted no abnormalities on examination, but diagnosed elevated blood pressure, peripheral neuropathy, and elevated liver enzymes. Tr. at 301. He instructed Plaintiff to decrease his pain medications, follow up in two to three weeks for a blood pressure check, and return in one month for a recheck of his liver. Tr. at 302.

On February 24, 2011, Plaintiff presented to Dr. Martin with a cough, shortness of breath, and dizziness. Tr. at 292. Dr. Martin observed rhonchi in the lower lobe of Plaintiff's right lung. Tr. at 293. He diagnosed pneumonia, administered Rocephin and Dexamethasone injections, and prescribed Levaquin. Tr. at 294. Plaintiff followed up for another antibiotic injection on March 4, 2011, and Dr. Martin prescribed Levaquin and Septra. Tr. at 288. 291.

Plaintiff presented to Dr. Martin on March 8, 2011, and reported left shoulder pain and numbness in his hands. Tr. at 283. Dr. Martin noted Plaintiff had weakness in his legs and weakness and pain in his bilateral arms that was worse on the right side. Tr. at 285. He diagnosed chest pain, tendonitis, and radiculitis and referred Plaintiff for a shoulder x-ray and a CT scan of his cervical spine. Tr. at 284, 287.

On May 5, 2011, Plaintiff reported to Dr. Martin that he had completed his antibiotics, but continued to experience shortness of breath, productive cough, swollen lymph nodes, chest tightness, runny nose, post-nasal drip, chest congestion, and chest

pain. Tr. at 279. Dr. Martin observed Plaintiff to have normal respirations, normal percussion and palpation, and to be clear to auscultation. Tr. at 281.

Plaintiff presented to Dr. Martin for pneumonia follow up on May 16, 2011. Tr. at 273. He continued to complain of a cough and chest pain. *Id.* A physical exam revealed normal respirations, percussion and palpation, and Plaintiff's lungs were clear to auscultation. Tr. at 275.

Plaintiff presented to Katie Nattier, PA-C ("Ms. Nattier"), on June 17, 2011, with a cough and congestion. Tr. at 269. He stated his symptoms had been ongoing with only short periods of relief since February. *Id.* He indicated he had been on antibiotics for 61 days and continued to experience breathing attacks. *Id.* Ms. Nattier indicated Plaintiff's cough may be caused by Lisinopril. Tr. at 272. She instructed Plaintiff to discontinue Lisinopril and to begin taking Norvasc for hypertension. *Id.*

On July 1, 2011, state agency medical consultant Elva Stinson, M.D., reviewed Plaintiff's records and provided a physical residual functional capacity ("RFC") assessment. Tr. at 239–46. She determined Plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand and/or walk for a total of about six hours in an eight-hour workday; could sit for a total of about six hours in an eight-hour workday; could frequently balance; could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards. *Id.*

Plaintiff presented to the emergency department at Palmetto Health Richland on July 25, 2011, complaining of chest pain and body aches. Tr. at 251. He indicated he was

experiencing intermittent episodes of numbness and tingling in his left arm. *Id.* Danielle Davis, M.D., noted no abnormal findings and provided diagnostic impressions of chest pain and gastric reflux. Tr. at 252–53.

Plaintiff presented to Dr. Martin on August 17, 2011, complaining of a fever, shortness of breath, headache, sinus pressure, palpitations, and chest pain. Tr. at 266. Dr. Martin diagnosed acute maxillary sinusitis and administered Rocephin and Dexamethasone injections. *Id.* Plaintiff received additional Rocephin injections on August 18, 19, and 20. Tr. at 258, 262, 265.

On September 22, 2011, Plaintiff underwent electromyography ("EMG") and NCS of his bilateral upper extremities. Tr. at 351–54. Neurologist John K. Baker, M.D. ("Dr. Baker"), indicated the studies demonstrated evidence of chronic and active left C5-6 and right C8 radiculopathies, with a possible underlying right medial neuropathy at Plaintiff's wrist. Tr. at 354.

Plaintiff presented to Dr. Baker for back and neck pain on October 17, 2011. Tr. at 348. He reported multiple complaints, including low back pain radiating into his legs, burning in the palms of his hands, neck pain causing headaches, tremulousness of his arms and legs, and numbness associated with turning his head. *Id.* He also indicated recent blood work had revealed abnormal liver function. *Id.* Dr. Baker observed Plaintiff to have no spinal tenderness or misalignment; to demonstrate normal shoulder shrug and sternocleidomastoid strength; normal motor strength and motor function; brisk lower extremity reflexes; intact sensation; normal gait; and ability to stand without difficulty. Tr. at 350. He indicated he was concerned about Plaintiff's numbness upon turning his

head and suspected myelopathy. *Id.* He recommended MRIs of Plaintiff's cervical and lumbar spine and indicated Plaintiff would have to obtain prices for "out of pocket pay." *Id.* He prescribed Nortriptyline and recommended Plaintiff use a back brace. *Id.* Dr. Baker noted that Plaintiff desired to defer treatment for his tremor because it was not as bothersome as his pain. *Id.*

Plaintiff underwent MRI of his cervical spine on November 14, 2011, which showed a broad-based left-sided disc deformity at C6-7 with disc material extending into the left neural foramina, as well as minor changes at other disc levels. Tr. at 346.

On November 30, 2011, Plaintiff followed up with Dr. Baker regarding cervical radiculopathy, chronic pain, and muscle spasms. Tr. at 343. He indicated that he did not start the prescription for Nortriptyline because of past problems with Cymbalta and Lexapro. *Id.* He complained of pain, muscle spasms, and tingling and burning in his legs. *Id.* He reported tremor, tingling, back pain, neck pain, and muscle pain and cramps. Tr. at 344. Dr. Baker observed Plaintiff to move all extremities symmetrically, to demonstrate normal gait, and to be able to stand without difficulty. *Id.* He assessed cervical root lesions with MRI confirmation of nerve root compression at left C6; benign tremor; back pain; cervical radiculopathy; and paresthesias/disturbance of skin sensation. *Id.* He indicated Plaintiff should take Nortriptyline and obtain epidural steroid injections, if he could obtain Medicaid and find a pain management physician willing to accept it. *Id.*

Plaintiff followed up with Dr. Baker for chronic pain and cervical radiculopathy on January 25, 2012. Tr. at 340. He indicated he took Nortriptyline intermittently, which provided some, but not a lot of relief. *Id.* He also stated he took opiate medications every

four hours. *Id.* Dr. Baker noted that Plaintiff reported leg spasms and pain that were treated by his primary care physician. *Id.* He observed Plaintiff to have normal gait, to be able to stand without difficulty, and to move all his extremities symmetrically. Tr. at 341. He assessed back pain, cervical radiculopathy, paresthesias/disturbance of skin sensation, and benign tremor. Tr. at 341. Dr. Baker noted Plaintiff was "significantly limited by insurance issues." Tr. at 342. He suspected Plaintiff's opiate dependence was not helping and hoped that epidural steroid injections could be offered to help Plaintiff's pain. *Id.*

On January 27, 2012, state agency physician Darla Mullaney, M.D. ("Dr. Mullaney"), completed a physical RFC assessment and indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and frequently reach, handle, and finger with the left upper extremity. Tr. at 364–71.

Plaintiff presented to Dr. Martin on February 9, 2012, complaining of a stiff neck and neck pain. Tr. at 465–66. Dr. Martin observed Plaintiff's neck to be non-tender and to have full ROM. Tr. at 466. Plaintiff's blood pressure was elevated, and Dr. Martin instructed him to restart his blood pressure medications. Tr. at 466–67.

On March 28, 2012, Plaintiff presented to Dr. Martin with paperwork to be completed for his attorney. Tr. at 472. He complained of neck pain, leg pain, and neuropathy. *Id.* Dr. Martin observed Plaintiff to have decreased sensation in his lower extremities. Tr. at 473. He completed a clinical assessment form regarding Plaintiff's

pain, a medical source statement, and medical interrogatories. Tr. at 526–27, 528–31, 532–33.

Plaintiff followed up with Dr. Martin on May 31, 2012, June 26, 2012, September 17, 2012, October 2, 2012, and December 18, 2012, and obtained medication refills. Tr. at 515–25. On January 25, 2013, Plaintiff followed up with Dr. Martin to discuss disability. Tr. at 513. Dr. Martin continued Plaintiff's pain medications and recommended Plaintiff be approved for disability benefits. Tr. at 514. Plaintiff saw Dr. Martin on April 23, 2013, for generalized abdominal pain, GERD, and unspecified peripheral neuropathy. Tr. at 512.

    C.    The Administrative Proceedings

        1.    The Administrative Hearing

            a.    Plaintiff's Testimony

At the hearing on May 9, 2013, Plaintiff testified he lived with his mother. Tr. at 66. He indicated that he stopped working in March 2009, when his employer moved its business to Charlotte, and that he collected unemployment benefits until 2011. Tr. at 69, 70.

Plaintiff testified he experienced tremors in his hands and legs. Tr. at 74. He indicated he felt pain in his bilateral arms and legs and numbness in his feet. Tr. at 75. He stated he was unable to stand for long periods because of weakness. *Id.* He indicated Oxycodone made it difficult for him to concentrate and maintain attention. Tr. at 77. He stated the tremors in his hands caused him to drop items. Tr. at 78.

Plaintiff testified he had a driver's license and drove two to three times per month. Tr. at 67. He indicated he tried to take out the trash and wash some dishes, but he generally did not perform household chores. Tr. at 71. He stated his mother did his laundry and shopped for groceries. *Id.* He testified he had not recently attended church. Tr. at 72. He indicated he regularly attended medical appointments, sometimes went to a neighborhood store or rode to the grocery store with his mother, and visited family or friends once or twice a year. *Id.* Plaintiff stated he lacked insurance and that his medical bills had depleted his savings. Tr. at 76.

b.    Witness' Testimony

Dr. Martin testified as a witness at the hearing. He stated he had treated Plaintiff since May 26, 2005, and that his specialty was family medicine. Tr. at 36. Dr. Martin indicated the conclusions in his medical source statement were based on physical examinations and clinical findings. Tr. at 37–38. He stated he had observed Plaintiff to have tremors in his hands and he indicated Plaintiff reported pain. Tr. at 38.

Dr. Martin testified he treated Plaintiff for peripheral neuropathy. *Id.* He indicated the source of Plaintiff's peripheral neuropathy was unknown, as was typical in 90 percent of cases involving non-diabetic patients. Tr. at 39. He stated he initially diagnosed Plaintiff with peripheral neuropathy on May 12, 2010, after Plaintiff visited Dr. Morgan, who prescribed Lyrica, but made no diagnosis. Tr. at 40. He indicated he referred Plaintiff for a CT scan of his lumbar spine in an attempt to determine whether Plaintiff's pain was caused by neuropathy or problems with his lumbar spine. *Id.* He stated the CT scan showed only mild arthritis, but no herniated disc or neural foraminal impingement.

Tr. at 41. Dr. Martin indicated Plaintiff had been unable to obtain studies of his lower extremities to confirm the diagnosis of peripheral neuropathy because he lacked insurance. Tr. at 44. Dr. Martin stated he based the diagnosis of peripheral neuropathy on clinical testing that showed Plaintiff to have decreased sensation to pinprick, pain, discoloration, and numbness in his lower extremities. Tr. at 45.

Dr. Martin testified Plaintiff was in pain at every visit—even those visits for other impairments. Tr. at 41. He indicated he had prescribed multiple medications, including Vicodin, Lyrica, and Metanx. *Id.* He stated the pain medications dulled Plaintiff's pain, but had not improved his condition. Tr. at 42.

Dr. Martin testified that Plaintiff presented with chest pain on March 8, 2011. Tr. at 42. He indicated Plaintiff was diagnosed with cervical radiculitis following an MRI. Tr. at 42–43. Dr. Martin stated cervical radiculitis could explain Plaintiff's complaints of nerve pain in his chest and arms. Tr. at 43.

Dr. Martin testified that he had prescribed both Lyrica and Gabapentin for Plaintiff's nerve pain, but that he discontinued Lyrica because it failed to improve Plaintiff's symptoms and was very expensive. Tr. at 45–46. He stated he prescribed Plaintiff one-and-a-half Oxycodone pills to be taken six times per day. Tr. at 46.

Dr. Martin testified that lifting more than 10 pounds occasionally could worsen Plaintiff's cervical spine and that Plaintiff was unable to lift and carry any weight on a frequent basis. Tr. at 51–52, 53. He indicated the tremor in Plaintiff's hands would cause moderate impairment to his ability to perform fine manipulation. Tr. at 53. He stated Plaintiff was severely limited by the pain in his legs and feet. *Id.* He testified Plaintiff's

ability to walk was visibly impaired and indicated individuals with neuropathy frequently stumbled, fell, and walked with an abnormal gait. Tr. at 54. He stated Plaintiff would be unable to stand and walk for six hours per day. *Id.* He indicated Plaintiff was unable to sit or stand for long periods. *Id.* He stated Plaintiff was unable to climb ladders and could not stoop, crouch, or crawl for long periods. Tr. at 55.

Dr. Martin discussed the results of Plaintiff's cervical MRI and NCS on Plaintiff's upper extremities. Tr. at 57–58. He stated that, although the MRI did not show a problem on the right side of Plaintiff's cervical spine, the NCS indicated the right side was affected as well. Tr. at 58. He testified Plaintiff had possible right median neuropathy at the wrist, which was consistent with carpal tunnel syndrome. Tr. at 58. He indicated Plaintiff's abilities to reach, handle, feel, push, and pull were affected. Tr. at 59. He stated Plaintiff should avoid heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, and vibrations because of his neuropathy. Tr. at 60.

Dr. Martin testified Plaintiff's impairments were severe in May 2010, but had worsened. Tr. at 61. He indicated Plaintiff was incapable of sedentary work because of his cervical radiculopathy and neuropathy. Tr. at 63. He stated surgery would not help Plaintiff's neuropathy, but that epidural injections may temporarily relieve the pain caused by cervical radiculopathy. Tr. at 64.

b.     Vocational Expert's Testimony

Vocational Expert ("VE") William Stewart reviewed the record and testified at the hearing. Tr. at 79–86. The VE categorized Plaintiff's PRW as a coin machine operator, *Dictionary of Occupational Titles* ("*DOT*") number 217.585-010, as requiring medium

13

exertion with a specific vocational preparation ("SVP") of three; an equipment operator, *DOT* number 859.683-010, as requiring medium exertion with an SVP of six; a forklift operator, *DOT* number 921.683-050, as requiring medium exertion with an SVP of three; a crane operator, *DOT* number 921.663-022, as requiring medium exertion with an SVP of four; and a cabinet builder and installer, *DOT* number 660.280-010, as requiring medium exertion with an SVP of six. Tr. at 80–82. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; could frequently reach, handle, and finger with the left upper extremity; should avoid concentrated exposure to extreme cold and heat; and should avoid all exposure to hazards. Tr. at 83. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified jobs at the light exertional level with an SVP of two as a packer, *DOT* number 920.682-166, with 3,400 positions in South Carolina and 150,000 positions nationally and an assembler, *DOT* number 706.684-022, with 3,500 positions in South Carolina and 100,000 positions nationally. Tr. at 84.

The ALJ next described an individual with the same vocational factors and impairments in the first hypothetical, but asked the VE to assume the individual was limited to lifting and carrying 10 pounds occasionally and less than 10 pounds frequently;

14

standing and/or walking at least two hours in an eight-hour workday; sitting about six hours in an eight-hour workday; never climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; frequently reaching, handling, and fingering with the left upper extremity; must avoid concentrated exposure to extreme cold and extreme heat; and must avoid all exposure to hazards. *Id.* The ALJ asked the VE if the hypothetical individual would be able to perform any work available in the local or national economy. *Id.* The VE identified sedentary jobs with an SVP of two as an order clerk, *DOT* number 209.567-014, with 2,200 positions in South Carolina and 55,000 positions nationally, and a table worker, *DOT* number 739.687-182, with 3,600 positions in South Carolina and over 100,000 positions nationally. Tr. at 85.

As a third hypothetical, the ALJ asked the VE to assume a hypothetical individual with the same vocational impairments as in the first hypothetical, but to assume the individual had the following limitations: lift and/or carry 10 pounds occasionally and less than 10 pounds frequently, stand and/or walk for less than two hours in an eight-hour workday; sit for less than six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; frequently reaching, handling, and fingering with the bilateral upper extremities; should avoid concentrated exposure to extreme heat and extreme cold; and should avoid all exposure to hazards. Tr. at 85–86. The ALJ asked the VE if the hypothetical individual could perform Plaintiff's PRW or any work available in the local or national

economy. Tr. at 86. The VE testified that such an individual would be incapable of working on a substantial gainful basis and could only perform part-time work. *Id.*

For a fourth hypothetical question, the ALJ asked the VE to assume a hypothetical individual with the same vocational factors and impairments identified in the first hypothetical who was limited as stated in Plaintiff's testimony. *Id.* She asked if the individual would be able to perform Plaintiff's PRW or any work available in the local or national economy. *Id.* The VE indicated the individual would be unable to perform any work on a reliable, productive, and sustained basis. *Id.*

### 2. The ALJ's Findings

In her decision dated August 22, 2013, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.
2. The claimant has not engaged in substantial gainful activity since May 15, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3. The claimant has the following severe impairments: cervical disc disease and cervical radiculopathy (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that he can except [sic] lift and carry up to 20 pounds occasionally and 10 pounds frequently. The claimant can stand or walk six hours in an eight-hour workday and sit for six hours in a workday. He can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs. He can occasionally balance, stoop, crouch, and crawl. Reaching, handling, and fingering on the left would be limited to frequently. He must avoid concentrated exposure to extreme cold

and heat and avoid all exposure to hazards such as unprotected heights and dangerous machinery.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on October 26, 1976, and was 33 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has a high school equivalency certificate and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 15, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 13–23.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     the Appeals Council erroneously declined to remand the case to the ALJ for consideration of new evidence;

2)     the ALJ did not adequately consider the medical opinions of record; and

3)     the ALJ did not assess Plaintiff's pain and other symptoms based on the provisions of SSR 96-7p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

17

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416,925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

(1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h), 416.920(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    New Evidence Submitted to Appeals Council

Plaintiff's attorney submitted to the Appeals Council a medical source statement from Dr. Baker dated April 25, 2012, that indicated Plaintiff was limited as follows: occasionally lift and/or carry less than 10 pounds based on "incredible pain"; frequently lift and/or carry zero pounds; stand and/or walk for one hour during an eight-hour workday and for 15 minutes without interruption; sit for one hour in an eight-hour workday and for 15 minutes without interruption; never climb, balance, stoop, crouch, kneel, or crawl; reaching and pushing/pulling affected; and limited ability to work at heights, with moving machinery, at temperature extremes, and with chemicals due to safety concerns. Tr. at 580–83. Dr. Baker indicated the limitations he noted were expected in some cases from the type and severity of Plaintiff's diagnoses. Tr. at 583. He indicated Plaintiff's diagnoses were supported by the objective findings and were not completely based upon Plaintiff's subjective complaints. *Id.*

On October 24, 2014, the Appeals Council issued a decision denying Plaintiff's request for review of the ALJ's decision. Tr. at 1–5. The Appeals Council indicated it received Dr. Baker's statement and included it in the record. Tr. at 4. However, it determined that the new evidence did not "provide a basis for changing" the ALJ's decision. Tr. at 2.

21

Plaintiff argues the Appeals Council should have remanded the case to the ALJ for consideration of Dr. Baker's opinion. [ECF No. 12 at 18–19]. He explains that the opinion, which was rendered more than a year before the ALJ's decision, was inexplicably submitted to the Appeals Council by his former counsel, but not provided to the ALJ. *Id.* at 19. He maintains that, because the ALJ gave Dr. Baker's findings great weight, Dr. Baker's work-preclusive opinion was particularly important. *Id.*

The Commissioner argues that remand is not warranted because Dr. Baker's opinion is not new and material and does not render the ALJ's decision unsupported by substantial evidence. [ECF No. 14 at 8]. She contends Dr. Baker's opinion was merely a repetitive recording of Plaintiff's subjective complaints. *Id.* at 14. The Commissioner argues the circumstances presented in this case are distinguishable from those that directed remand in *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011), because, unlike the ALJ in *Meyer*, this ALJ did not cite an "evidentiary gap" or base her decision, in part, on the absence of an opinion statement from Dr. Baker. *Id.* at 10.

"If 'dissatisfied' with an ALJ decision as to entitlement to disability benefits, a claimant 'may request' that the Appeals Council review 'that action.'" *Meyer*, 662 F.3d at 704, citing 20 C.F.R. § 404.967. The Appeals Council reviews the request and is directed to grant it under the following conditions: if there is an apparent abuse of discretion by the ALJ; if there is an error of law; if the ALJ's action, findings, or conclusions were not supported by substantial evidence; or if the case concerns a broad policy or procedural issue that may affect the general public interest. 20 C.F.R. §§ 404.970(a), 416.1470.

Along with the request for review, a claimant may submit additional evidence that was not before the ALJ at the time of the decision. *Meyer*, 662 F.3d at 705. "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b). "Evidence is new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'" *Meyer*, 662 F.3d at 705, citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). If the new and material evidence relates to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. 20 C.F.R. §§ 404.970(b), 416.1470(b).

If the Appeals Council finds that the ALJ's "action, findings, or conclusion is contrary to the weight" of all evidence, including the new and material evidence, the Appeals Council will grant the request for review and either issue its own decision on the merits or remand the case to the ALJ. *Meyer*, 662 F.3d at 705, citing 20 C.F.R. §§ 404.970(b), 416.1470(b). On the other hand, if after considering all evidence, the Appeals Council decides that the ALJ's actions, findings, and conclusions were not contrary to the weight of the evidence, the Appeals Council can deny review with or without explaining its rationale. *Id.* at 705–06.

After reviewing new evidence submitted to the Appeals Council, the court should affirm the ALJ's decision to deny benefits where "substantial evidence support[ed] the ALJ's findings." *Id.* at 707, citing *Smith v. Chater*, 99 F.3d 635, 638–39 (4th Cir. 1996).

However, if a review of the record as a whole shows "that new evidence from a treating physician was not controverted by other evidence in the record," the court should reverse the ALJ's decision and find it to be unsupported by substantial evidence. *Id.*, citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.3d 93, 96 (4th Cir. 1991). In *Meyer*, the court recognized that a third scenario existed—that in which the evidence was not so one-sided as to allow the court to determine, upon consideration of the record as a whole, whether substantial evidence supported the ALJ's denial of benefits. *Id.* The court found that the appropriate course of action was to remand the case for further fact finding because it was not the role of the court to assess the probative value of competing evidence. *Id.*

Here, the ALJ did not consider Dr. Baker's opinion because it was not included in the record prior to her decision. However, the ALJ indicated she gave "great weight" to Dr. Baker's findings. Tr. at 20. She noted that "[a]s a treating neurologist, Dr. Baker had the opportunity to examine and conduct testing on the claimant" and "[h]is findings were consistent with the other objective medical evidence in the record." *Id.*

Dr. Baker's opinion was new evidence because it was the only assessment of Plaintiff's functional abilities rendered by his treating neurologist. *See Wilkins*, 953 F.2d at 96. The ALJ accorded "great weight" to Dr. Baker's findings based, to some extent, on Dr. Baker's status as a treating physician with a specialty in neurology. *See* Tr. at 20. If presented with Dr. Baker's opinion, the ALJ could have reasonably given it great weight for the same reasons that she gave great weight to his findings. Therefore, Dr. Baker's

opinion was material because there was "a reasonable possibility" that it "would have changed the outcome." *See Wilkins*, 953 F.2d at 96.

"In reviewing the Appeals Council's evaluation of new and material evidence, the touchstone of the Fourth Circuit's analysis has been whether the record, combined with the new evidence, 'provides an 'adequate explanation of [the Commissioner's] decision.'" *Turner v. Colvin*, C/A No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015), citing *Meyer*, 662 F.3d at 707 (quoting *DeLoatche v. Heckler*, 715 F.3d 148, 150 (4th Cir. 1983)). The instant case differs from *Meyer* in that the ALJ did not cite the absence of an opinion statement from Dr. Baker as an evidentiary gap that supported her decision to deny Plaintiff's claim. However, the addition of Dr. Baker's opinion revealed a chasm in the ALJ's assessment of Dr. Baker's findings that makes it difficult for this court to determine whether her conclusions were supported by substantial evidence. The ALJ inferred that Dr. Baker's findings supported her RFC finding, but Dr. Baker's subsequently-submitted opinion indicated Plaintiff's RFC to be reduced significantly below the level the ALJ assessed. *Compare* Tr. at 15 and 20, *with* Tr. at 580–83. While the Commissioner argues that Dr. Baker's opinion should carry no weight because it was based on the subjective complaints the ALJ rejected as not being credible, Dr. Baker specified that his opinion was "not completely" based on Plaintiff's subjective complaints. *See* Tr. at 583. The record reflects that Dr. Baker administered EMG/NCS that revealed chronic and active left C5-6 and right C8 radiculopathies and referred Plaintiff for a cervical MRI that showed a broad-based left-sided disc deformity at C6-7, with disc material extending into the left neural foramina. Tr. at 346, 354. In light of this

25

objective evidence and in consideration of Dr. Baker's specific indication that his opinion was based upon diagnostic findings, the undersigned cannot find that the ALJ would have dismissed Dr. Baker's opinion for the same reasons she dismissed Plaintiff's subjective complaints. *See* Tr. at 583. Furthermore, the undersigned cannot overlook the significance of Dr. Baker's opinion as that of a treating physician with a specialization in neurology, which weighs in favor of the opinion under the provisions of 20 C.F.R. §§ 404.1527(c) and 416.927(c) and was important to the ALJ in considering Dr. Baker's findings. *See* Tr. at 20. As was the case in *Meyer*, the court "simply cannot determine whether substantial evidence supports the ALJ's denial of benefits here." *Meyer*, 662 F.3d at 707. Therefore, the undersigned recommends this matter be remanded so that Dr. Baker's opinion may be adequately considered and weighed.

2. Medical Opinions

On March 28, 2012, Dr. Martin completed a questionnaire labeled "CLINICAL ASSESSMENT OF PAIN." Tr. at 526–27. He indicated Plaintiff's pain was profound, intractable, and virtually incapacitating. Tr. at 526. In response to the question "[t]o what extent will such physical activity as walking, standing, bending, stooping, moving of extremities, etc., increase the degree of pain experienced by this patient?," Dr. Martin selected "[i]ncrease of pain to such a degree as to require increased medication for pain or substantial amounts of bed rest." *Id.* In response to the question "[t]o what extent can the medication(s) prescribed (or typically prescribed in cases like this one) be expected to affect the patient in this case?," Dr. Martin indicated "[m]edication will place severe limitation on the patient's ability to perform even the most simple everyday tasks." *Id.*

Dr. Martin further opined that Plaintiff would be totally restricted and unable to function at a productive level of work. Tr. at 527. He indicated little improvement was expected and that Plaintiff's pain was likely to increase with time. *Id.* He indicated treatment for pain had no appreciable impact or only briefly altered the level of pain that Plaintiff experienced. *Id.*

Dr. Martin also completed a medical source statement on March 28, 2012, and indicated Plaintiff was limited as follows: occasionally lift and/or carry less than 10 pounds due to cervical and lumbar radiculopathy; frequently lift and/or carry no weight; standing and walking affected by neuropathy and lumbar radiculopathy; stand and/or walk for three to four hours in an eight-hour workday and for one hour without interruption; has to move and intermittently put feet up secondary to radiculopathy; sit for three to six hours in an eight-hour workday and for one hour without interruption; occasionally balance and kneel; never climb, stoop, crouch, or crawl; reaching, handling, feeling, and pushing/pulling affected by loss of strength, feeling, and sensation; and restricted with regard to heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, and vibration. Tr. at 528–30. Dr. Martin indicated he based his opinion on the MRI and NCS and did not rely primarily on Plaintiff's subjective complaints. Tr. at 346, 531.

Dr. Martin indicated in medical interrogatories that he began treating Plaintiff on March 20, 2004. Tr. at 532. He specified Plaintiff's impairments included cervical and lumbar radiculopathy, panic disorder, neuropathy with constant pain, hypertension, and vitamin D deficiency. *Id.* He stated Plaintiff experienced constant pain, decreased

sensation, and decreased strength. *Id.* He opined that Plaintiff was incapable of sedentary work. *Id.* Dr. Martin indicated Plaintiff had been disabled since 2009 and that his condition could not be significantly improved with medical treatment. Tr. at 533.

Plaintiff argues the ALJ did not consider the medical opinions of record in accordance with the requirements of 20 C.F.R. § 404.1527, SSR 96-2p, and SSR 96-5p. [ECF No. 12 at 22]. He maintains the ALJ erroneously rejected Dr. Martin's opinion because he was not a specialist. *Id.* at 26. He contends the evidence did not support the ALJ's conclusion that Dr. Martin's opinion was not supported by objective test results or clinical findings. *Id.* at 26–27. Finally, Plaintiff argues the ALJ did not provide a sufficient explanation for her decision to accord greater weight to the opinions of the non-treating, non-examining state agency physicians than to the opinion of Plaintiff's treating physician. *Id.* at 29.

The Commissioner argues Dr. Martin's clinical findings were unremarkable and his opinion was inconsistent with the evidence. [ECF No. 14 at 13]. She maintains Dr. Martin's treatment notes did not reflect the objective findings specified in his testimony and that the ALJ reasonably gave little weight to Dr. Martin's opinion based on the inconsistencies between his opinion statements and his treatment notes. *Id.* at 13, 17.

ALJs are required to carefully consider medical source opinions of record. SSR 96-5p. The Social Security Administration's ("SSA's") regulations direct that ALJs give treating physicians' opinions controlling weight as long as they are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2). If an ALJ finds that a treating source's opinion is not entitled to controlling weight because it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record, the ALJ must weigh all of the medical opinions of record based on the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). *Id.*; SSR 96-2p. The relevant factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c).

Not only do 20 C.F.R. §§ 404.1527(c) and 416.927(c) specify the relevant factors to be considered in assessing medical opinions, they also guide ALJs in weighing those factors. A treating source's opinion generally carries more weight than any other opinion evidence in the record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Nevertheless, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are

adequately explained by the medical source and reinforced by medical signs and laboratory findings are entitled to greater weight than unsubstantiated opinions. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004).[3] Furthermore, medical opinions from specialists with respect to medical issues related to their particular areas of specialty should be accorded more weight than opinions of physicians regarding impairments outside their areas of specialty. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).

"[A]n express discussion of each factor is not required as long as the ALJ demonstrates that he applied the . . . factors and provides good reasons for his decision." *Hendrix v. Astrue*, C/A No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). This court should not disturb an ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The ALJ cited several reasons for her decision to give "very little weight" to Dr. Martin's opinion. Tr. at 20. She wrote "[a]lthough Dr. Martin is a treating physician, I find that his opinions are based largely on the claimant's subjective complaints and not based on the majority of the objective evidence in the medical record." *Id.* She pointed

---

[3] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

out that Dr. Martin was "board certified in family practice and not neurology." *Id.* She found that Dr. Martin's opinions were not supported by the objective test results or clinical findings of Dr. Martin or any other treating or examining physician. *Id.* She stated there did not "appear to be any clinical findings whatsoever to support" Dr. Martin's opinion and found that Plaintiff's course of treatment was not consistent with him being "truly disabled." *Id.* Finally, the ALJ indicated Dr. Martin's opinion was rendered either based on his sympathy for the Plaintiff or upon Plaintiff's insistence that Dr. Martin support his claim for disability benefits. *Id.*

The undersigned recommends the court find the ALJ's decision to give very little weight to Dr. Martin's opinion was unsupported by substantial evidence. The ALJ's decision to discount Dr. Martin's opinion was based primarily on a perceived lack of objective evidence and clinical findings. *See* Tr. at 20. In *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987), the court explained that the ALJ erred in stating that the weight to be given to a treating physician's opinion "depends on the extent to which it is supported by specific and completed clinical findings and other evidence." The court clarified that a treating physician's opinion "may be disregarded only if there is persuasive contradictory evidence." *Id.*, citing *Foster v. Heckler*, 780 F.2d 1125, 1130 (4th Cir. 1986); *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983). Dr. Martin's opinion was rendered in his capacity as Plaintiff's treating physician and could not be disregarded absent persuasive contradictory evidence. *See id.*; *see also Wilkins v. Secretary, Dept. of Health and Human Services*, 953 F.2d 93, 96 (4th Cir. 1991). Although the ALJ indicated Dr. Martin's opinion was inconsistent with his findings or

the findings of any other treating or examining physician, she ignored that part of Dr. Martin's testimony in which he interpreted the objective findings and clarified the basis for his opinion. *See* Tr. at 20, 40–55. She erroneously stated that none of Dr. Martin's records showed objective testing of sensation, but a review of the record indicates Dr. Martin observed Plaintiff to have decreased sensation in his lower extremities on March 28, 2012. *Compare* Tr. at 19, *with* Tr. at 472. The ALJ indicated her decision to discount Dr. Martin's opinion was based in part on Dr. Martin's specialty in family practice as opposed to neurology and she gave great weight to the findings of Dr. Baker, Plaintiff's neurologist. Tr. at 20. The ALJ suggested that she weighed Dr. Martin's opinion against Dr. Baker's findings, found that the two were inconsistent with one another, and accorded Dr. Baker's findings greater weight because of his specialization as a neurologist. *See* Tr. at 20.  Such a weighing of the evidence is consistent with the provisions of 20 C.F.R. §§ 404.1527(c)(5) and 416.927(c)(5), when comparing conflicting medical findings or opinions. However, in light of the subsequently-submitted opinion of Dr. Baker that was consistent with Dr. Martin's opinion, the ALJ's reasoning appears to be flawed and a reconsideration of the consistency factor is warranted. *Compare* Tr. at 580–83, with Tr. at 526–27, 528–30. Because the ALJ did not base her decision to disregard Dr. Martin's opinion on persuasive contradictory evidence, the undersigned recommends the court find substantial evidence did not support her decision to accord it very little weight.

### 3. Assessment of Pain and Other Symptoms

Plaintiff argues the ALJ did not address the credibility of his statements regarding pain and other symptoms in accordance with the provisions of SSR 96-7p. [ECF No. 12

at 29–31]. He maintains the ALJ failed to consider his lack of insurance and inability to pay for additional testing and medical treatment. *Id.* at 32. He argues the ALJ did not acknowledge his statements to Dr. Martin regarding his pain and symptoms and erroneously concluded that he did not report symptoms or limitations of disabling severity. *Id.* at 33. He also contends the ALJ misrepresented his activities of daily living. *Id.* at 33–34.

The Commissioner argues the ALJ properly assessed Plaintiff's credibility in accordance with the regulations. [ECF No. 14 at 15]. She maintains the ALJ cited numerous reasons for her finding that Plaintiff's alleged symptoms were not entirely credible. *Id.* at 16–17.

The intensity, persistence, and functionally-limiting effects of symptoms should only be considered after a claimant has established the existence of a medically-determinable impairment that could reasonably cause the pain and symptoms reported. SSR 96-7p. However, once the claimant establishes the existence of a condition reasonably likely to cause the alleged symptoms, he may "rely exclusively on subjective evidence to prove the second part of the test." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006).

"[T]he adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record" to determine whether the claimant's statements are credible. SSR 96-7p. To assess the claimant's credibility, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information

provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.*

The ALJ cannot reject the claimant's testimony about his pain or other symptoms without providing an explanation that is supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

The ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's statements were "not substantiated by the total evidence of record" and were not "entirely credible." Tr. at 16. She found that the clinical picture reflected in Plaintiff's treatment records showed "quite limited objective findings to support the degree of limitations asserted by the claimant." Tr. at 19. She cited Plaintiff's receipt of unemployment benefits based upon his certification that he was able to perform full-time work. *Id.* She referenced Plaintiff's daily activities. Tr. at 19–20. She also indicated that Plaintiff did not report symptoms or limitations of disabling severity to his doctors. Tr. at 20.

The undersigned recommends the court find the ALJ did not adequately consider the longitudinal medical record in assessing Plaintiff's credibility. "In general, a longitudinal medical record demonstrating an individual's attempts to seek medical

treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements." SSR 96-7p. The ruling further provides that "persistent attempts by the individual to obtain relief of pain or other symptoms," through increasing medications, trying a variety of treatments, obtaining referrals to specialists, or changing treatment sources "may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms." *Id.* The ALJ indicated "[t]he notes of his physicians do not show that he has reported to them symptoms or other limitations of disabling severity, in spite of Dr. Martin's statements that he has done so." Tr. at 20. The ALJ's statement appears to be a mischaracterization of the record, which shows Plaintiff to have reported pain to his physicians on multiple occasions and to have sought additional treatment, including medication changes and referral to specialists. *See* Tr. at 232 (Plaintiff reported bilateral leg pain to Dr. Morgan), 251 (Plaintiff presented to the emergency room with chest pain, numbness, and tingling in his left arm), 283 (Plaintiff reported left shoulder pain and numbness in his hands), 285 (Plaintiff complained of weakness in his arms and legs), 299 (Plaintiff indicated he continued to experience severe pain), 310 (Plaintiff indicated his leg pain was no longer responsive to Vicodin; Dr. Martin changed Plaintiff's medication from Vicodin to Oxycodone), 317 (Plaintiff indicated he had been out of Vicodin for several days and was experiencing significant pain; Plaintiff complained that his heart raced and his blood pressure became elevated when his pain increased), 324 (Plaintiff

complained of pain in his lower back, arms, and legs and worsened tremors in his hands; Plaintiff indicated the pain in his legs was not reduced by Demerol), 328 (Plaintiff indicated to Dr. Martin that his pain radiated from his lower back to his legs and was unresponsive to Vicodin; Plaintiff described pain as burning, radiating, throbbing, and exacerbated by walking, squatting, working, and performing any activities), 331 (Dr. Martin referred Plaintiff to Dr. Morgan for evaluation of his leg pain), 334 (Plaintiff reported leg pain for over a year that was associated with numbness, cold, and trembling and was unresponsive to medication for restless leg syndrome), 340 (Plaintiff indicated to Dr. Baker that Nortriptyline did not provide much relief and that he took opiates every four hours), 343 (Plaintiff reported pain, muscle spasms, tingling, and burning in his legs), 348 (Dr. Martin referred Plaintiff to Dr. Baker for neurological consultation regarding neck and back/limb pain; Plaintiff indicated to Dr. Baker that he experienced low back pain that radiated into his legs, burning in the palms of his hands, neck pain that caused headaches, tremulousness of his arms and legs, and numbness upon turning his head), 352 (Dr. Martin referred Plaintiff to Dr. Baker for EMG and NCS), 472 (Plaintiff complained to Dr. Martin of neck pain, leg pain, and neuropathy). Because the ALJ did not consider elements of the longitudinal treatment record that bolstered Plaintiff's credibility, she did not adequately assess Plaintiff's credibility.

Furthermore, it appears that the ALJ drew negative inferences about Plaintiff's failure to pursue additional testing and treatment without considering indications in the record that Plaintiff lacked the financial resources to obtain such treatment. For example, the ALJ indicated "[t]he clinical picture reflected in these treatment records shows quite

limited objective findings to support the degree of limitations asserted by the claimant"
and concluded that "the course of treatment pursued by the claimant's providers is not
consistent with what one would expect if the claimant were truly disabled, as Dr. Martin
suggested." Tr. at 19, 20. Pursuant to SSR 96-7p, "the adjudicator must not draw any
inferences about an individual's symptoms and their functional effects from a failure to
seek or pursue regular medical treatment without first considering any explanations that
the individual may provide, or other information that may explain infrequent or irregular
medical visits or failure to seek medical treatment." *See* 20 C.F.R. §§ 404.1530, 416.930.
Fourth Circuit precedent directs that ALJs may not deny benefits to claimants who lack
the financial resources to obtain treatment. *See Lovejoy v. Heckler,* 790 F.2d 1114, 1117
(4th Cir.1986) (holding that the ALJ erred in determining that the plaintiff's impairment
was not severe based on her failure to seek treatment where the record reflected that she
could not afford treatment); *Gordon v. Schweiker,* 725 F.2d 231, 237 (4th Cir.1984) ("it
flies in the face of the patent purposes of the Social Security Act to deny benefits to
someone because he is too poor to obtain medical treatment that may help him"). When a
claimant alleges an inability to afford treatment and an ALJ considers the failure to obtain
treatment as a factor that lessens the claimant's credibility, the ALJ must make specific
findings regarding the claimant's ability to afford treatment. *See Dozier v. Colvin*, C/A
No. 1:14-29-DCN, 2015 WL 4726949, at *4 (D.S.C. Aug. 10, 2015) (remanding the case
because the ALJ did not include specific factual findings regarding the resources
available to the plaintiff and whether "her failure to seek additional medical treatment
was based upon her alleged inability to pay"); *Buckley v. Commissioner of Social Sec.*

*Admin.*, C/A No. 1:14-124-TLW, 2015 WL 3536622, at *21 (D.S.C. Jun. 4, 2015) (finding the ALJ adequately considered the claimant's allegation that she lacked the financial resources to obtain treatment as part of the credibility determination where the ALJ cited specific evidence in the record that contradicted the claimant's allegation). Here, the medical evidence suggests Plaintiff was unable to obtain additional testing or treatment because of a lack of insurance and financial resources. *See* Tr. at 44 (Dr. Martin testified Plaintiff had been unable to obtain studies of his lower extremities to confirm the diagnosis of peripheral neuropathy because he lacked insurance), 76 (Plaintiff testified he lacked insurance and that his medical bills had depleted his savings), 323 (Dr. Martin indicated Plaintiff needed an MRI and NCS on his lower extremities, but was "selfpay" and could not afford the tests), 342 (Dr. Baker stated Plaintiff was significantly limited by insurance issues), 344 (Dr. Baker recommended Plaintiff pursue epidural steroid injections and pain management treatment, but indicated Plaintiff would have to be approved for Medicaid to pursue the recommended treatment). Because the record reflects Plaintiff's inability to obtain additional testing and treatment resulted from his lack of insurance and financial resources, the ALJ was required to consider and evaluate this evidence as part of the credibility determination. However, she made no specific findings regarding Plaintiff's ability to obtain additional treatment and, instead, made negative inferences regarding the lack of additional objective testing and Plaintiff's course of treatment. Therefore, the ALJ's credibility determination is flawed.

Finally, the ALJ cited Plaintiff's daily activities as a factor that weighed against a finding that he was disabled, but, in doing so, she significantly misstated Plaintiff's

testimony regarding his daily activities in a way that made it appear he was capable of doing much more than the record reflected. *Compare* Tr. at 19–20 ("The claimant testified at the hearing that he is able to perform many activities of daily living for himself without restriction. He stated that he can drive a vehicle, care for his dog . . . and that he can take out the trash and wash dishes. He also testified that he visits with friends on occasion, has attended church in the past, and drives himself to doctor's appointments and to go grocery shopping with his mother."), with Tr. at 67 (Plaintiff testified he drove "[o]nly when I need to for doctors' appointments or whatever appointments I need to keep" and "maybe two or three times in a month"), 71 (Plaintiff stated he would "try to take out the trash, or if I can try to stand there and wash some dishes. But other than that, I don't do anything."), 71–71 (Plaintiff indicated "my mom has been doing my laundry" and "[s]ometimes I will ride with my mom [to the grocery store] to get out of the house, but I do not do any of the shopping."), 72 (In response to a question about whether he attended church, Plaintiff responded "[i]t has been a long time, so not recently I haven't." In response to a question asking where he went outside of his home, Plaintiff responded "I go to the appointments with my doctor, and there's a store right down the street that I will go to sometimes when I feel able." He stated he visited family or friends "[p]robably once or twice in a year.").

For the foregoing reasons, the undersigned recommends a finding that the ALJ failed to assess Plaintiff's credibility in accordance with the provisions of SSR 96-7p.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

October 16, 2015                                   Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).